IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

PHILIP H. TARBELL, BARBARA A. LAZORE,
ERMA WHITE-MOORE, RUSSELL P. LAZORE,
LOREN OAKES, GLENN HILL, SR., CAROL T.
HERNE, KERNEY COLE, Individually and as
Purported Representatives of the St. Regis
Mohawk Tribe,

                    Plaintiffs,

                                Civ. Action No.
    vs.                            7:02-CV-1072 (DEP)

DEPARTMENT OF THE INTERIOR, BUREAU
OF INDIAN AFFAIRS, HON. NEAL McCALEB,
as Assistant Secretary of the Department of the
Interior, Commissioner of Interior Affairs,

                    Defendants,

ALMA RANSOM, HILDA SMOKE and PAUL
THOMPSON, Individually and as Purported
Representatives of the St. Regis
Mohawk Tribe,

                Intervenors-Defendants.
_____

APPEARANCES:           OF COUNSEL:

FOR PLAINTIFFS:

BREEZE, RHODES-DEVEY     MICHAEL RHODES-DEVEY, ESQ.
LAW FIRM
421 New Karner Road
P.O. Box 15072
Albany, New York 12212-5072

FOR DEFENDANTS:

DEPT. OF THE INTERIOR          JOHN HARRINGTON, ESQ.
75 Spring St., SW, Suite 304
Atlanta, GA 30303

HON. GLENN T. SUDDABY          WILLIAM H. PEASE, ESQ.
Office of the United States Attorney.  CHARLES ROBERTS, ESQ.
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261

FOR INTERVENORS-DEFENDANTS:

CROWELL & MORING LAW FIRM      PETER B. WORK, ESQ.
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595

BARR & ASSOCIATES LAW FIRM     RUSSELL D. BARR, ESQ.
125 Mountain Road
Stowe, Vermont 05672

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## DECISION AND ORDER

The plaintiffs, who are members of the St. Regis Mohawk Indian Tribe and proponents of Tribal government reform, have commenced this action seeking judicial review of four distinct Department of the Interior ("DOI") administrative agency actions, relating to a longstanding dispute over leadership of the St. Regis Mohawk Indian Tribe.  Their complaint calls upon the court to accomplish a seemingly simple task of examining

the propriety of those actions, utilizing a well-defined and familiar standard of review.  Enmeshed within the challenged administrative determinations of the DOI and its Bureau of Indian Affairs ("BIA"), however, are complex issues which implicate internal Indian tribal politics and self-governance – matters with which the courts and the DOI have wrestled for some time, though without reaching consensus.

Because I find, based upon my review of the record, that the agency actions in question were not the product of a considered analysis of the leadership dispute, but instead resulted from a misconception that the agency had been ordered by another court to reject the plaintiffs' position, I am granting plaintiffs' motion and will direct that each of the four challenged determinations be vacated and the matter remanded to the DOI for further proceedings consistent with this opinion.

I.      BACKGROUND

    A.      Historical Background

In order to bring the disputed administrative actions into focus, it is important to understand the history of governance of the St. Regis Mohawk Tribe, with its chronicled internal struggles.[1]  For the most part,

---

[1]      Although the background associated with the ongoing leadership dispute was recounted in great detail by the court in *Ransom v. Babbitt*, 69 F. Supp.2d 141

the facts associated with the ongoing debate over Tribal leadership are uncontested, though the parties disagree concerning their legal import.

The St. Regis Mohawk Tribe, one of the Six Nations of the Iroquois Confederacy – also known as the Haudenosaunee – is a federally acknowledged Indian tribe whose recognition dates back as far as adoption and implementation on May 31, 1796 of the Seven Nations of Canada Treaty, 7 Stat. 55.  Complaint (Dkt. No. 1) ¶ 10.  St. Regis Mohawk Tribal lands are geographically bounded by both northern New York State and southern Canada.  *Id.*  Historically, the Tribe was governed under a Three Chief System, with three chiefs and three sub-chiefs elected for staggered three year terms, and a tribal clerk chosen every third year.[2]  Complaint (Dkt. No. 1) ¶ 12.  Under the Three Chiefs regime, the three elected chiefs acted in a combined legislative, executive and judicial capacity.  *Id.*

---

(D.D.C. 1999) ("*Ransom I*"), I have nonetheless elected to reiterate some of that background for contextual purposes.

[2]     In their complaint, plaintiffs attribute formal recognition of the Three Chief regime to an enactment adopted by the New York State Legislature in 1802, at the request of Tribal leaders, acknowledging that form of government.  Complaint (Dkt. No. 1) ¶ 11 (citing N.Y. Indian Law § 100 *et seq.*).  This, they contend, had the legal effect of exempting the Tribe from the Indian Reorganization Act, 25 U.S.C. § 461 *et seq.*, and obviating the need for BIA approval for implementation of a Tribal constitution.  Complaint (Dkt. No. 1) ¶ 11.

4

1.    Tribal Leadership Reform Efforts

The efforts of some St. Regis Mohawk Tribal members, beginning in or around 1975, to bring about leadership reform, initially through adoption of written by-laws providing for a system of Tribal government to replace the Three Chief form, serve as a backdrop for this litigation.  Tarbell Aff. (Dkt. No. 29) ¶¶ 3-4, 9.  A critical point in those endeavors occurred on June 3, 1995 when a referendum was conducted to determine whether a proposed Tribal Constitution should be adopted.  *Id.* ¶¶ 10-12; *Ransom I*, 69 F. Supp.2d at 143.  The results of that referendum, when interpreted most favorably to the plaintiffs – as proponents of the Constitutional form of government – revealed that the measure was supported by 50.935093% of the 909 valid ballots cast.  Tarbell Aff. (Dkt. No. 29) ¶¶ 12-13; *Ransom I*, 69 F. Supp.2d at 143.

While this much is uncontested, the parties vigorously debate the significance of the referendum result.  Those espousing the Three Chiefs form of government argue that the measure failed, since the Constitution's adoption clause provided that "[t]his Constitution shall be adopted upon certification that fifty-one [percent] (51%) of those present and voting in the referendum called on June 03, 1995 have voted in favor of adopting

the Constitution of the Saint Regis Mohawk Tribe."  Tarbell Aff. (Dkt. No.

29) ¶ 11.  Since the vote fell short of this threshold, although by only the

slightest of margins, the intervenor-defendants argue that it was not

implemented.

Plaintiffs, on the other hand, note that the referendum was

conducted pursuant to Tribal Council Resolution ("TCR") 95-115, which

was officially signed and enacted by the Three Chiefs Government on

March 31, 1995, providing for adoption of the Constitution in the event of a

majority vote favoring its ratification.  Tarbell Aff. (Dkt. No. 29) ¶ 10.  In

further support of their position plaintiffs cite testimony suggesting that the

intent of the drafters, in penning the 51% figure, was that the proposition

would pass if approved by a simple majority.  *Id.* ¶¶ 11-13.  In light of their

belief that only a mere majority was required for ratification of the

proposed Constitution, the ruling Chiefs then in power under the Three

Chiefs System unanimously enacted a resolution (TCR 59-116) certifying

the referendum results as approving adoption of the Tribal Constitution,

and proceeded thereafter to rule the Tribe as leaders acting under

authority of that instrument.  Tarbell Aff. (Dkt. No. 29) ¶¶ 13, 20-22.

Ensuing debate regarding the June 3, 1995 referendum results led

to a second Tribal referendum, held on June 1, 1996, to address the question of whether the Constitutional vote had been properly certified.[3] *Ransom I*, 69 F. Supp.2d at 143-44.  By a count of 651 to 339, the Tribal members casting ballots in that referendum signaled their belief that the Tribal Constitution had been improperly certified.[4]  *Ransom I*, 69 F.Supp.2d at 144.

The June 1, 1996 referendum – the legitimacy of which plaintiffs challenge – led to enactment on June 10, 1996 by the elected Tribal Council members of TCR 96-84, rescinding certification of the Constitution and returning the Tribe to the Three Chiefs System of governance. *Ransom I*, 69 F.Supp.2d at 144.  By TCR 96-85 – another measure also enacted on that same date – a referendum was scheduled for June 15, 1996 to pose the following question to Tribal members: "[d]o you favor continuing with our present elected officials?"  *Id.*  By a fairly substantial margin the voters responded to this third referendum by essentially

---

[3]      The question presented in the second referendum was simply "[i]s the Tribal Constitution of the Saint Regis Mohawk Tribe valid?" *Ransom I*, 69 F. Supp.2d at 144.

[4]      At the time of the referendum casting into doubt the validity of the Constitution, a new Tribal Council was elected to serve under the new Constitution, resulting in the potentially anomalous circumstance of the chosen Council members being elected to serve in a nonexistent government.

rejecting the incumbent leadership and opting instead to conduct a "clean slate" election of Tribal leaders. *Id.* Those "clean slate" elections were subsequently held on June 29, 1996, resulting in the designation of Chiefs Alma Ransom, Hilda Smoke and Paul O. Thompson – the three intevenors-defendants and advocates of the Three Chief Government – as well as Sub-Chiefs Barbara Lazore, a named plaintiff, and non-parties Bryan Garrow and John Bigtree, Jr. *Id.*

Unfortunately, the rancor associated with Tribal leadership did not end with this series of developments which, some have argued, were presumptively demonstrative of the will of the St. Regis Mohawk people. The controversy was fueled when the BIA, which operates under the aegis of the DOI, chose not to recognize the results of the June 29, 1996 "clean slate" election, instead siding with the plaintiffs in this action by recognizing the Constitutional Tribal Government.[5] *Ransom I*, 69 F.Supp.2d at 144-45. Relying upon two decisions issued by Temporary St. Regis Mohawk Tribal Judge Christine Z. Deom, then-Acting Eastern Area BIA Director Franklin Keel rejected arguments in favor of the Three

---

[5]     The court in *Ransom* has attributed this to the BIA's apparent benevolent desire to see the Tribe "embrace a constitutional form of government." *Ransom I*, 69 F.Supp.2d at 154.

Chiefs Government, advising that the agency instead considered the incumbent members of the Tribal Government to be "entitled to recognition as St. Regis Mohawk Leaders" under the Tribal Constitution, thereby recognizing Edward Smoke, as Chief and CEO; Carol Herne, as tribal clerk; Rosalie Jacobs, as Vice Chief; and Philip Tarbell, Hilda Smoke, Alan White, Doug Smoke and Carol Ross, as Tribal Council members.  Complaint (Dkt. No. 1) ¶ 37.  That determination was summarily affirmed by the Interior Board of Indian Appeals ("IBIA"), following an appeal of that ruling filed on August 2, 1996.  *Id.* ¶¶ 38-39; *Ransom I*, 69 F.Supp.2d at 145-46.  The IBIA's unfavorable ruling was later reaffirmed on request by the Three Chiefs Government for reconsideration.  *Ransom I*, 69 F.Supp.2d at 146.

The BIA's determination led to yet a fourth Tribal referendum, conducted on November 30, 1996 pursuant to TCR 96-56.  Complaint (Dkt. No. 1) ¶ 40*; Ransom I*, 69 F.Supp.2d at 146.  That referendum challenged the authority of the Tribal Court, and specifically of Judge Deom – whose ruling formed the basis for the BIA's support of the Constitutional Government – and resulted in a finding that Judge Deom had acted without legal authority by an overwhelming majority vote of 394

9

in favor of that result, with only seventeen members voting in support of the Tribal Court's authority. *Ransom I*, 69 F.Supp.2d at 146. The BIA nonetheless continued to adhere to its earlier recognition of the Constitutional Government, in the face of the Three Chiefs Government's request for recognition based upon the fourth referendum vote, at the same time questioning the legitimacy of the latest referendum. *Id.* at 146-47.

### 2.   Tribal Court Legitimacy

As one might surmise, the sparring over control of the Tribe's leadership has spilled over into the area of the Tribal judiciary. Historically, the power to resolve disputes within the Tribe rested with the Tribal Chiefs. Complaint (Dkt. No. 1) ¶¶ 12, 23; Tarbell Aff. (Dkt. No. 29) ¶ 16. As part of the relatively recent efforts aimed toward Tribal governmental reorganization, those dispute resolution powers were transferred in December of 1994, by resolution TCR-94-F and the Judiciary Act of 1994, to an independent Tribal Court. *Id.* The drafters of the Judiciary Act stated that part of its purpose was to "enact provisions of law that establish the general organization and powers of the tribal court system, define council procedure for appointments of judges and provide

for removal of judges and court system staff members from office under certain circumstances." *Id.*

While this much does not appear to be controversial, the steps later taken to implement that resolution as well as later efforts calculated to bring about its recission are sharply disputed by the parties.  The plaintiffs in this action maintain that upon certification of the adoption of the Constitution, the newly formed Constitutional Government enacted TCR 95-219-B on August 17, 1995, appointing Judge Deom, who is described as a "Mohawk woman attorney", as the first Chief Judge of the Mohawk Tribal Court.  Complaint (Dkt. No. 1) ¶ 24; Tarbell Aff. (Dkt. No. 29) ¶ 17. This act, plaintiffs maintain, has since been the subject of judicial ratification, including by decisions in cases emanating from this court. Complaint (Dkt. No. 1) ¶¶ 37-38.  The intervenor-defendants, by contrast, dispute the legitimacy of the Tribal Court and the judicial authority of Judge Deom.  As will be seen, questions regarding the continuing legitimacy of the Tribal judiciary form the underpinning for a portion of the controversy now pending before the court for consideration.

### 3.   Ransom I Decision

In 1998 the intervenor-defendants in this case, as representatives of

11

the Three Chiefs Government, commenced suit under the Administrative

Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, in the United States

District Court for the District of Columbia challenging a series of DOI

actions. *Ransom v. Babbitt*, No. CIV. A-98-1422 (D.D.C., filed 1998)

("*Ransom*").  At issue in *Ransom*, in a general sense, was the soundness

of the BIA's recognition of the Constitutional Tribal Government.[6]  The

BIA's determination to recognize the newly formed government had been

predicated upon the agency's belief that any challenges to the

Constitutional Government's authority should be raised in a tribal forum.

*See*, *e.g.*, *Ransom I*, 69 F.Supp.2d at 146-47.  The Three Chiefs

challenged that position in *Ransom*, arguing that the authority of the

tribunal to which the BIA would defer was cast in serious doubt by the

November 30, 1996 referendum, in which only seventeen of those 411

voting supported the Tribal Court's authority.  Neither the plaintiffs herein

nor any other representatives of the Constitutional Government faction

were parties to the *Ransom* litigation.[7]  69 F.Supp.2d at 147.

_____

[6]      Although the court's decision granting summary judgment in favor of the plaintiffs in *Ransom I* references several agency actions at various DOI levels as being implicated, it does not specifically identify the agency actions under challenge and effectively overridden by virtue of that decision.

[7]      The DOI sought permission to amend its answer in *Ransom* to include, as an affirmative defense, failure of the plaintiffs in that case to join representatives of

Plaintiffs' APA challenge in *Ransom* of the BIA's recognition of the Constitutional Government was submitted to District Judge Colleen M. Kollar-Kotelly on cross-motions for summary judgment, resulting in the entry of judgment in favor of the plaintiffs. 69 F.Supp.2d at 155.  In her decision in *Ransom I* Judge Kollar-Kotelly, while recognizing the need for deference to tribal court interpretations of tribal law, observed that the BIA is empowered – and indeed obligated – to determine whether those interpretations are reasonable.  *Id.* at 151-52.  In this instance, the *Ransom* court rejected Tribal Court Judge Deom's finding that the Constitutional measure was adopted by the Tribe, despite the fact that less than the specified fifty-one percent (51%) of those voting approved the measure, as being unreasonable.  *Id.* at 152-53.  Judge Kollar-Kotelly went on to note the "incongruity" in allowing a judge whose authority derived from the Constitution to pass upon the question of whether the Constitution was properly adopted.  *Id.* at 152.  Judge Kollar-Kotelly

_____

the Constitutional Government as necessary or indispensable parties.  *Ransom I*, 69 F.Supp.2d at 147-48.  That motion was denied both as untimely and on the merits, the court finding that "[w]hile the Constitutional Government might be affected by this Court's review of BIA's actions, their joinder remains unnecessary for the Court to conduct its review."  *Id.* (citation omitted).  Subsequent efforts on the part of representatives of the Constitutional Government to intervene in *Ransom*, for purposes of pursuing an appeal from the district court's September 30, 1999 decision, were unsuccessful.  *See Ransom v. Babbitt*, No. 98-1422 (D.D.C. March 16, 2002) (*Ransom II*), A.R. Vol. I (Dkt. No. 49) Tab 20.

13

concluded that by virtue of their decision to follow Judge Deom's determination and defer to that court in connection with future challenges, BIA officials had "failed to fufill their responsibility to interpret tribal laws and procedures in a reasonable manner in order to carry out their duty to recognize a tribal government." *Id.* at 153 (citations omitted).

Quite obviously, of particular concern to Judge Kollar-Kotelly in *Ransom I* was the BIA's continued deference to the Tribal Court, given that the authority of that institution to act was challenged and in fact rejected in various Tribal referenda. *Id.* at 153. Judge Kollar-Kotelly was also critical of the agency's position of "federal non-interference with tribal affairs" and concluded that "[b]y not determining for themselves whether or not the Constitution was valid, [BIA officials] were derelict in their responsibility to ensure that the Tribe makes its own determination about its government consistent with the will of the Tribe and the principles of tribal sovereignty." *Id.* (citations omitted).

The *Ransom I* court concluded that by its actions the BIA had ignored the will of the St. Regis Mohawk people, as expressed through various referenda. *Ransom I*, 69 F.Supp.2d at 153-54. The court also found that the agency had shirked its responsibilities by dismissing

internal appeals as moot when representatives of the Three Chiefs were elected to positions under the Constitutional Government, concluding that "[u]pon review, Defendants' actions reveal themselves to be arbitrary, capricious, and contrary to law." *Ransom I*, 69 F.Supp.2d at 155.  As a consequence, the court ordered the entry of summary judgment in favor of the plaintiffs and against the agency, although without identifying what particular agency actions were implicated, or what if any specific steps should be taken by the BIA to allay the court's articulated concerns.  *Id.*

B.    Agency Actions Now At Issue

1.    August 25, 2000 IBIA Appeal Dismissal

The events leading to the first agency action under challenge in this suit were set in motion by the issuance on February 4, 2000 of a letter by BIA Field Representative Dean White addressed to representatives of the Three Chiefs Government.  A.R. Vol. I (Dkt. No. 49) Tab 4.  That communication followed issuance of the district court's decision in *Ransom I* as well as the ensuing receipt of letters dated November 15, 1999 and December 14, 1999 from representatives of the Constitutional Government to the agency advocating a contrary position (*see* A.R. Vol. I (Dkt. No. 49) Tabs 2,3).  In his letter, White advised that pending any

15

appellate review of *Ransom I*, the BIA would now recognize the Three

Chiefs Government and the individuals elected on June 29, 1996 to serve

in leadership positions in that government, subject to any intervening

resignations.  A.R. Vol. I (Dkt. No. 49) Tab 4.  The letter also directed that

new elections be held "in the near future, and in no event later than June

2000 when the tribe would normally hold its elections."  *Id.*

Following an apparently unsuccessful attempt, through letter dated

February 8, 2000 to DOI Secretary Kevin Grover, to convince the agency

to overturn the position announced in the February 4, 2000 letter (*see*

A.R. Vol. I (Dkt. No. 49) Tab 5), the Constitutional Government

representatives formally appealed that ruling on February 24, 2000 to the

Eastern Area Office BIA Regional Director.  A.R. Vol. I (Dkt. No. 49) Tab

6.  In that appeal, *inter alia*, the Constitutional representatives argued that

the recognition of the Three Chiefs Government was contrary to Mohawk

law, and additionally observed that in any event the terms of office of the

Three Chiefs recognized by the BIA had in fact expired on July 1, 1999.

*Id.*  On April 24, 2000 Eastern Region Director Franklin Keel issued a

written determination denying that appeal.  A.R. Vol. I (Dkt. No. 49) Tab 9.

In his decision, Director Keel characterized the White letter as "merely an

implementation of the decision in [*Ransom I*]," making the following

observation with regard to the Constitutional representatives' position:

> Although I find your argument persuasive and your
> reasoning sound, your argument is, in essence, an
> appeal of [*Ransom I*].

*Id.*  On the question of expiration of the terms of the elected Three Chiefs

representatives, Keel noted that in light of the timing of the issuance of the

court's decision in *Ransom I* a June election would be appropriate and,

implicitly, therefore ratified extension of the elected offices of those

representatives already serving until such an election could be held.

The Constitutional faction appealed the Regional Director's decision

to the IBIA.  A.R. Vol. I. (Dkt. No. 49) Tab 10.  Addressing that appeal,

IBIA Chief Administrative Judge Catherine A. Lynn issued a determination

dated May 31, 2000, concluding as follows:

> The Board believes that the best solution to the
> situation which the Tribe presently faces is the
> holding of a tribal election.  The Superintendent's
> letter indicated that the next tribal election would
> normally be held in June 2000.  The Board
> assumes that the Tribe and/or the tribal officials
> recognized by BIA have been preparing to hold an
> election in June 2000.  It also assumes that both
> factions of the Tribe realize that it would not be in
> the Tribe's best interest for them to boycott that
> election.

A.R. Vol. I (Dkt. No. 49) Tab 11.  Accordingly, the IBIA stayed

consideration of the pending appeal "[i]n order to allow the Tribe to

resolve this leadership dispute through the electoral process".  *Id.*

On June 6, 2000 representatives of the Three Chiefs Government

notified the IBIA of the results of the awaited June, 2000 elections and

requested, in light of that development, that the pending appeal be

dismissed.  A.R. Vol. I (Dkt. No. 49) Tab 12.  That application was

vigorously opposed by representatives of the Constitutional Government.

A.R. Vol. I (Dkt. No. 49) Tab 15.  Announcing that it was following its

established tradition of dismissing any appeal rendered academic by valid

tribal elections conducted during its pendency, by decision dated August

25, 2000 the IBIA granted the motion and dismissed the pending appeal

as moot.  A.R. Vol. I (Dkt. No. 49) Tab 16.

2.  <u>June 25, 2002 McCaleb Letter</u>

The second administrative action now under challenge was

precipitated by a letter dated March 19, 2002 from the Constitutional

Government representatives' counsel, Michael Rhodes-Devey, Esq., to

BIA Eastern Area Director Franklin Keel requesting that the subject of

recognition of the governing authority of the St. Regis Mohawk Tribe be

18

revisited.  A.R. Vol. I (Dkt. No. 49) Tab 22.  As a basis for that request,

Attorney Rhodes-Devey asserted that an intervening decision issued by

Judge Kollar-Kotelly suggested that the BIA had misconstrued her earlier

decision in *Ransom I*, mistakenly interpreting it to require that the BIA

recognize the Three Chief Government when, in fact, in her later decision

she pointedly stated that was not the case.[8]  A.R. Vol. I (Dkt. No. 49) Tab

22 (citing *id.* Tab 20).  Following an exchange of communications between

the competing groups and the agency, including several voicing

complaints by Constitutional Government representatives concerning

unfairness of the process utilized by the agency (*see* A.R. Vol. I (Dkt. No.

49) Tabs 29-31) and submission of a fact sheet and argument by the

Three Chief Governmental representatives (*see* A.R. Vol. I (Dkt. No. 49)

Tabs 24,25), a letter was issued on June 5, 2002 by DOI Assistant

Secretary for Indian Affairs Neal McCaleb, denying reconsideration of the

agency's earlier recognition decision.  A.R. Vol. I (Dkt. No. 49) Tab 32.  In

outlining the reasoning supporting that decision, Assistant Secretary

McCaleb noted that despite having been given the opportunity to do so,

---

[8]     Attorney Rhodes-Devey's letter was followed by another, dated April 2, 2002, directly from the Constitutional Government representatives to Assistant Secretary of Indian Affairs Neal A. McCaleb and DOI Associate Solicitor for Indian Affairs Philip N. Hogen, making a similar request.  A.R. Vol. I (Dkt. No. 49) Tab 23.

the Constitutional Governmental representatives had not pressed their claim before the BIA for reversion to the Constitutional form of government, choosing instead to challenge tribal elections held within the context of the Three Chiefs form of government.  *Id.*

### 3.    Hogen Letters Dated June 26, 2002 and July 12, 2002

The third and fourth agency actions questioned in plaintiffs' complaint were the result of a request from this court to the DOI for indication of its position on a particular issue related to Tribal Court authority.  The genesis of the court's inquiry, which was sent at the urging of the Second Circuit that clarification of the agency's viewpoint on certain issues be obtained, was the dismissal by District Judge Thomas J. McAvoy of a complaint in a separate action, *Park Place Entertainment Corp., et al. v. Marlene Arquette, et al.*, 113 F.Supp.2d 322 (N.D.N.Y. 2000), for lack of subject matter jurisdiction.  That dismissal was based upon the failure of the plaintiffs in *Park Place Entertainment* to exhaust available remedies by placing the matter in controversy before the Tribal Court prior to commencing suit in the Northern District of New York.  *Id.*

On appeal by the plaintiffs in that case from Judge McAvoy's ruling, the Second Circuit issued a summary order on January 11, 2002

remanding the matter to the district court for further consideration.  A.R.

Vols. II and III (Dkt. No. 50) Tab 6.  The Second Circuit's decision

specifically requested development of the record to provide indication of

the "DOI's current position with regard to the legitimacy of the

constitutional government and constitutional court", an inquiry prompted

by a letter dated October 6, 2000 from Michael J. Anderson, DOI Deputy

Assistant Secretary for Indian Affairs to Chiefs Ransom, Smoke and

Thompson (*see* A.R. Vols II and III (Dkt. No. 50) Tab 3) advising that the

DOI "is now precluded [since *Ransom*] from recognizing the former

constitutional government, including the judicial system established under

that constitution."  *Id.*

Following issuance of the Second Circuit's decision, I conducted a

conference with counsel for the parties in *Park Place Entertainment*,

during which it was determined that the most provident way to proceed

would be by way of a direct inquiry from the court to the agency

addressing the question raised by the court of appeals.[9]  Accordingly, on

April 15, 2002 I sent a letter to Assistant Secretary of Indian Affairs Neal

A. McCaleb seeking advice concerning the agency's "current position with

---

[9]       Plaintiffs' counsel in this action represented certain of the parties in *Park Place Entertainment*.

regard to the legitimacy of the constitutional government and

constitutional court." A.R. Vols. II and III (Dkt. No. 50) Tab 7 (quoting *id.*

Tab 6).

The DOI's initial response to my inquiry came in the form of a letter

dated June 26, 2002 from Philip N. Hogen, Associate Solicitor, Division of

Indian Affairs. A.R. Vols. II and III (Dkt. No. 50) Tab 8. In that letter,

Associate Solicitor Hogen advised that in view of the district court's

decision in *Ransom I*, the DOI has recognized the Three Chief

Government, and consequently does not regard any official appointed by

the Constitutional Government as authorized to act on behalf of the St.

Regis Mohawk Tribe. *Id.* The letter went on to note that although the

Tribal Court System was created by the Judiciary Act adopted in 1994, no

person was thereafter appointed or elected by the Three Chief

Government to preside over that court and, consequently, the Court has

not been recognized by the DOI as empowered to issue binding

"expressions of tribal law." *Id.* The letter concluded by noting that the

person holding herself out as a Tribal Judge – an appointee of the

Constitutional Government – was not properly installed and, consequently,

was without authority to act for the Tribal Court. *Id.*

22

Following submissions to the agency from St. Regis Mohawk Tribal Court Chief Judge Carrie E. Garrow as well as from plaintiffs' counsel (*see* A.R. Vols. II and III (Dkt. No. 50) Tabs 11, 12, respectively), a second agency letter addressing my inquiry concerning Tribal Court authority was issued on July 12, 2002 by Associate Solicitor Hogen.  A.R. Vols. II and III (Dkt. No. 50) Tab 13.  That letter, while arriving at the same conclusion, offered a different rationale, noting that the Judiciary Act of 1994 was rescinded by Tribal Council Resolution 99-02, adopted in May of 1999.  *Id.* This second letter also noted the later passage of Tribal Council Resolution 2000-136, adopted in July, 2000, reaffirming that no St. Regis Mohawk Tribal Court System was then recognized or authorized by the Tribe.[10]  A.R. Vols. II and III (Dkt. No. 50) Tab 13.  Associate Solicitor Hogen's letter concluded by noting that the advice given concerning appointment or election on an interim basis by the Three Chief Government of any judge authorized to preside over a tribal court of general jurisdiction remained accurate.  *Id.*  There is no indication in the record of a request by any party for internal reconsideration or review of

---

[10]     Both of those resolutions were enacted under the auspices of the Three Chiefs Government and, as will be seen, thus depend for their validity upon the authority of that government to act on behalf of the Tribe.  *See* pp. 49-51, *post.*

23

these agency findings.

II.   THIS ACTION

Plaintiffs commenced this action on August 19, 2002.  Dkt. No. 1.  In

their complaint, which names as defendants the DOI, the BIA, and Neal

McCaleb, Assistant Secretary of the DOI and the agency's Commissioner

of Indian Affairs, plaintiffs seek review under the APA of the four separate

agency actions discussed above.  *Id.*

Issue in the action was joined by the filing of an answer on behalf of

the named defendants on November 22, 2002.  Dkt. No. 5.  Defendants-

intervenors Alma Ransom, Hilda Smoke and Paul Thompson, as

representatives of the Three Chief Government, subsequently sought, and

were granted, permission to intervene as defendants in the suit.[11]  Dkt.

No. 21.  An answer was thereafter filed on behalf of those additional

---

[11]   At the time of their intervention, the three defendants-intervenors referred to themselves as "chiefs", and sought a court designation that they were the legitimate representatives of the Tribe.  In my order dated January 22, 2003, which granted their request for intervention, I declined the invitation to address the issue of Tribal representation, and determined that I would permit the the intervening defendants to assert their right to represent the Tribe and claim the title "chief" in connection with the action.  In a subsequent order dated April 3, 2003 I granted the motion of intervenor-defendants to dismiss the Tribe as a party plaintiff and directed the adjustment of court records to reflect that the Tribe is not a party, and that in light of the underlying dispute over Tribal leadership none of the named individual parties would be referred to as "chief".  The parties are in agreement that dismissal of the Tribe as a party plaintiff does not divest the plaintiffs of standing to pursue this administrative review proceeding.

parties on January 24, 2003.  Dkt. No. 22.

On April 7, 2003 the original and intervening defendants together
initiated the dispositive motion process by filing a joint motion for summary
judgment.  Dkt. Nos. 39, 43, 44, 48.  Plaintiffs thereafter responded in
opposition to that motion and in support of a cross-motion for summary
judgment in their favor.  Dkt. Nos. 46, 47.  A reply memorandum, as well
as the administrative record, have since been filed by the defendants.
Dkt. Nos. 48-50.  The parties' cross-motions, which are now ripe for
determination, are before me for determination based upon their consent
to my jurisdiction in this matter pursuant to 28 U.S.C. § 636(c).  *See also*
Fed. R. Civ. P. 73(a).

III.    DISCUSSION

A.     Summary Judgment Standard

Summary judgment is warranted when "the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the
affidavits . . . show that there is no genuine issue as to any material fact
and that the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.
Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247, 106 S. Ct. 2505, 2509-10 (1986).  The moving party has the initial

burden of demonstrating that there is no genuine issue of material fact to

be decided with respect to any essential element of the nonmoving party's

claim.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n. 4.  Once that

burden is met, the opposing party must show, through affidavits or

otherwise, that there is a material factual issue for trial.[12]  Fed. R. Civ. P.

56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at

250, 106 S. Ct. at 2511.

In deciding a summary judgment motion, the court must resolve any

ambiguities and draw all inferences from the facts in a light most favorable

to the nonmoving party.  *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir.

1998).  When presented with cross-motions for summary judgment, the

court's mission is to "evaluate each party's motion on its own merits,

taking care in each instance to draw all reasonable inferences against the

party whose motion is under consideration."  *Boy Scouts of America v.

Wyman*, 335 F.3d 80, 88 (2d Cir. 2003) (quoting *Hotel Employees & Rest.

Employees Union, Local 100 v. City of New York Dep't of Parks &*

---

[12]    A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

*Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)).  Summary judgment is

inappropriate where "review of the record reveals sufficient evidence for a

rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of*

*Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

> B.   Legal Significance Of Plaintiffs' Failure To Provide A Local
>      Rule 7.1(a)(3) Statement

In their opposition to plaintiffs' cross-motion for summary judgment,

defendants argue that the motion should be treated as a nullity in light of

plaintiffs' failure to include within their motion papers a statement of

material facts not in dispute.  As defendants correctly observe, the rules of

this court require that "[a]ny motion for summary judgment shall contain a

Statement of Material Facts" which must comply with certain specific

requirements outlined within the rule.  *See* N.D.N.Y.L.R. 7.1(a)(3).  The

governing rule goes on to provide that "[f]ailure of the moving party to

submit an accurate and complete Statement of Material Facts shall result

in a denial of the motion."  *Id.*

Local Rule 7.1(a)(3) does not directly address the obligations of a

party which, like the plaintiffs herein, has included a proper Local Rule

7.1(a)(3) statement in opposition to an adversary's summary judgment

motion but has failed to include its own affirmative Local Rule 7.1(a)(3)

27

statement in support of a summary judgment cross-motion.  The rule is also silent as to whether it applies to an APA review proceeding, which typically focuses upon a fully developed administrative record, although implicit in its failure to carve out any exceptions is the conclusion that the rule does have application in such instances.

The record plainly reflects that while plaintiffs have properly responded to defendants' Local Rule 7.1(a)(3) statement, they have not submitted such a statement in support of the cross-motion requesting summary judgment in their favor.  Ordinarily, such a failure would be fatal to the plaintiffs' motion.  This case, however, is somewhat unique.  For the most part, the arguments raised by the parties in their cross-motions can and will be addressed on the basis of the administrative record now before the court.  To deny defendants' motion for summary judgment on the merits and signal a belief that plaintiffs should ultimately prevail on their administrative challenge, but nonetheless withhold that determination for the present time based upon a technical failure to comply with Local Rule 7.1(a)(3) – particularly since plaintiffs' summary judgment motion is in all other respects proper – would in my judgment represent an inefficient allocation of judicial and party resources.  Accordingly, I will exercise my

discretion to overlook plaintiffs' non-compliance with the court's own internal requirements in this instance and, in the interest of justice, proceed to decide both summary judgment motions notwithstanding this procedural shortcoming.

     C.    <u>APA Standard Of Review</u>

     Under the APA, a court is authorized to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law".  5 U.S.C. § 706(2)(A); *see also Schneider v. Feinberg*, 345 F.3d 135, 142 (2d Cir. 2003) (citing 5 U.S.C. § 706(2)(A)).  This review standard, which is narrow and "'particularly deferential'", *see Erie-Niagara Rail Steering Comm. v. Surface Transp. Bd.*, 247 F.3d 437, 441 (2d Cir. 2001), requires a reviewing court "to determine whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action including whether there is a rational connection between the facts found and the choice made."  *J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391 (2d Cir. 2000) (internal quotations omitted); *see also Gully v. National Credit Union Admin. Bd.*, 341 F.3d 155, 163 (2d Cir. 2003).  A court's review under section 706(2)(A) is both

substantive and procedural; accordingly, the court must both review the

ultimate decision of the agency, taking care not to substitute its judgment

for that of the agency, and additionally "scrutinize all aspects of the

agency proceedings in order to decide whether it has acted fairly and

within the proper legal framework". *Atkinson Lines, Inc. v. United States*,

381 F. Supp. 39, 41-42 (S.D. Ohio 1974); *see also Greene v. Babbitt*, 943

F. Supp. 1278, 1285 (W.D. Wash. 1996) (citing *Atkinson*).

When undertaking APA review, a court may properly grant summary

judgment based upon a finding that there are no genuine issues of

material fact in dispute. *Ransom I*, 69 F.Supp.2d at 149; *see also Soler v.

G&U, Inc.*, 615 F. Supp. 736, 740 (S.D.N.Y. 1985). In an action such as

this, in which the court's task is limited to determining whether the agency

action under scrutiny can withstand APA review, the critical consideration

is the record which was before the agency at the time of the

determination, and thus the need for resolution of fact issues which often

are sharply contested, and very often preclude the entry of summary

judgment, does not generally apply. *See The Ocean Conservancy v.

Evans*, 260 F.Supp.2d 1162, 1168-69 (M.D. Fla. 2003) (citing, *inter alia*,

*Loggerhead Turtle v. County Council of Valusia Cty.*, 120 F.Supp.2d

1005, 1013 (M.D. Fla. 2000)).  As one court has noted,

> [i]n reviewing administrative agency decisions, the
> function of the district court is to determine whether
> or not as a matter of law, evidence in the
> administrative record permitted the agency to
> make the decision it did, and summary judgment is
> an appropriate mechanism for deciding the legal
> question of whether an agency could reasonably
> have found the facts as it did.

*Sierra Club v. Dombeck*, 161 F.Supp.2d 1052, 1064 (D. Ariz. 2001) (citing

*City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th

Cir. 1997)).

> D.    Plaintiffs' Motion To Strike

In their response to defendants' motion, plaintiffs seek an order

striking the declaration of Lorraine M. White, identified therein as the St.

Regis Mohawk Tribe's General Counsel – International Affairs, dated April

4, 2003.  *See* Defendants' Memorandum (Dkt. No. 43) Attachment 1.  The

basis for that application is the fact that the affidavit was not before the

BIA at the time that the agency determinations now at issue were

rendered, and is therefore not properly a part of the administrative record

to be considered by the court in this proceeding.

The APA provides that in cases such as this requiring judicial review

of an agency action, "the [reviewing] court shall review the whole record or

31

those parts of it cited by a party."  5 U.S.C. § 706.  As can be seen, the

section under which this proceeding is brought itself limits the court's

review to the record which was before the agency.  *See Camp v. Pitts*,

411 U.S. 138, 142, 93 S. Ct. 1241, 1244 (1973) ("the focal point for

judicial review should be the administrative record already in existence,

not some new record made initially in the reviewing court"). While courts

have recognized the need to depart from this rule in certain appropriate

situations, such exceptions are rare, and available only in limited

circumstances:

> Courts may conduct plenary review, and consider
> additional information obtained from the parties
> through affidavits or testimony, only when the
> administrative record is so inadequate as to
> prevent the reviewing court from effectively
> determining whether the agency considered all . . .
> consequences of its proposed action.

*National Audobon Soc'y v. Hoffman*, 132 F.3d 7, 14-15 (2d Cir. 1997)

(citation omitted).

The disputed declaration in this case does not articulate a basis

upon which the court could conclude that it falls within this narrow

exception, nor have the defendants in their papers convincingly made

such an assertion.  The White declaration now at issue addresses the

32

question of clean slate Tribal elections, the circumstances under which

Tribal referenda may be held, and the ultimate issue of whether a

Constitutional Government of the St. Regis Mohawk Tribe is in existence.

No explanation is offered as to why the present record, without the benefit

of the declaration's contents, is inadequate to allow the court to conduct a

meaningful APA review of the DOI's actions.

Finding that no compelling reason has been offered to accept

extrinsic evidence which was not before the BIA at the time of the

determinations at issue in this case, I concur in plaintiffs' assessment

that this court's review should be limited to matters which were before the

agency.  Accordingly, I will grant plaintiffs' request and order the White

declaration stricken from the record.

E.    Merits Of Plaintiffs' Challenges

Plaintiff's four agency action challenges implicate two separate and

discrete issues.  The first relates to the ultimate and hotly contested

question of Tribal leadership, and specifically the form of government to

be recognized by the United States in conducting its relations with the

Tribe.  The second concerns the authority of the St. Regis Mohawk Tribal

Courts.   As will be seen, however, these issues are inextricably

interwoven, and hinge ultimately upon a determination of which Tribal

faction – the Three Chiefs group or the Constitutional Government

advocates – should be recognized by the DOI as having been properly

empowered by the Mohawk peoples.

1.    Tribal Leadership

In support of their challenge to the administrative acts at issue,

plaintiffs assert the failure of the DOI, following the issuance of *Ransom I*,

to engage in a process calculated to allow the disparate viewpoints to be

fully aired, with an eye toward rendering an informed decision regarding

tribal leadership, taking into account all relevant factors.  In support of

their argument, plaintiffs liken the process leading up to the challenged

determination to a formal agency adjudication subject to the restrictions of

5 U.S.C. § 554.  Alternatively, they argue that in the event the process is

viewed by the court as more akin to administrative rulemaking, or

legislating, then it was nonetheless subject to certain minimal

requirements described under the APA, but not met in this instance.

Unlike many adjudicative responsibilities with which various

administrative agencies are specifically tasked by statute, the matter at

hand is not one which is explicitly delegated to a prescribed hearing

process before the DOI or its sub-agency, the BIA.  Instead, what is at issue essentially is a policymaking determination which potentially affects an entire classification of individuals, in this case a segment of the St. Regis Mohawk Tribe.  The applicability of the Due Process Clause of the Fifth Amendment and its impact upon such administrative decisionmaking activities, as distinct from more traditional judicial administrative proceedings, is a matter which has been vigorously debated, as evidenced by the strong disagreement voiced on the subject by the two authors of perhaps the most authoritative administrative law treatise currently in print.  *See* 2 Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise §§ 9.2, 9.2A (3d ed. 1994).

This is a debate in which I need not engage, since in my view resolution of the question is not outcome determinative.  What is at issue in this instance is the sufficiency of the administrative process followed by the agency, and whether it can withstand scrutiny under the more traditional APA test.  As can be seen, I find that it cannot, given the agency's failure to follow procedures reasonably calculated to effectuate the district judge's ruling in *Ransom I*.

Disputes over questions of tribal leadership of the nature now at

issue are not foreign to the BIA.  By statute, the BIA's mission is to "have

the management of all Indian affairs and of all matters arising out of Indian

relations."[13]  25 U.S.C. § 2.  The significance of the BIA's role has been

magnified by relatively recent events, given that "[t]he already competitive

tribal political process has intensified as the stakes associated with being

in power have increased."  Porter, 7 Kan. J.L. & Pub. Pol'y 72 (1997), WL

7-WTR Kan. J.L. & Pub. Pol'y 72 at 2.  The implications associated with

the BIA's determination of who the federal government will recognize and

deal with on behalf of a particular tribe extend well beyond the traditional

questions of dispersal of United States funds for infrastructure, health

services and education; now at stake is the prospect of "adding the

incentive of great wealth [derived from development of Class Three

casino-style gaming operations] to the victors of the political spoils game."

*Id.* at 16.

As one might gather, determinations regarding tribal leadership

---

[13]      While in its early stages the BIA was given considerable latitude in carrying out its assigned functions, in 1934 Congress passed the Indian Reorganization Act, 48 Stat. 987, codified at 25 U.S.C. § 476 *et seq.*, "intend[ing] to eliminate much of the administrative control over tribal governance that had previously been exercised by the Bureau of Indian Affairs[.]"  Robert B. Porter, *Strengthening Tribal Sovereignty through Government Reform: What are the Issues?*  7 Kan. J.L. & Pub. Pol'y 72 (1997), WL 7-WTR Kan. J.L. & Pub. Pol'y 72 at 25.

recognition can have significant impact upon tribal members, and are generally complex, requiring the BIA to consider the unique history and circumstances of the specific tribe involved. *See*, *e.g.*, *Greene v. Babbitt*, 64 F.3d 1266 (9th Cir. 1995). With the agency's consideration of a matter of such complexity and import, one naturally would envision a process which affords all interested parties a meaningful opportunity to offer support for their respective contentions. Presumably, once all positions are fully aired, the agency could then issue a decision stating its conclusion regarding leadership recognition and detailing the reasoning employed to arrive at the given result. In that way, the resulting determination could then be challenged through internal agency channels and, if deemed appropriate, in the courts under the auspices of the APA, and any reviewing body would have the benefit of elucidation of the agency's rationale.

The decision in *Ransom I*, as well as subsequent opinions from the *Ransom* court, strongly suggest that this is precisely the sort of meaningful process which Judge Kollar-Kotelly envisioned for the BIA in deciding who to recognize as the properly sanctioned leaders of the St. Regis Mohawk Tribe. What rings clear from the court's decision in

*Ransom I* is its finding that the BIA had previously cast a blind eye upon

the highly complex question of whether the Constitution was properly

adopted.  This point is illustrated by one portion of Judge Kollar-Kotelly's

opinion, in which she observed that

> [DOI officials] failed to fulfill their responsibility to
> interpret tribal laws and procedures in a
> reasonable manner in order to carry out their duty
> to recognize a tribal government.

*Ransom I*, 69 F.Supp.2d at 153 (citations omitted).  Judge Kollar-Kotelly

went on to note that

> [b]y not determining for themselves whether or not
> the Constitution was valid, Defendants were
> derelict in their responsibility to ensure that the
> Tribe make its own determination about its
> government consistent with the will of the Tribe
> and the principles of tribal sovereignty.

*Id.* at 153 (citation omitted).

   If it was not clear from her initial decision that Judge Kollar-Kotelly

envisioned a considered, methodical process calculated to allow the BIA

to work through the highly complex issues surrounding Tribal leadership,

that position was crystallized in her subsequent decision, which

addressed the appealability of the earlier determination, and specifically

whether it constituted a final order – that later determination having been

made in the context of an application by representatives of the

Constitutional Government to intervene in the case.  Concluding that the

*Ransom I* decision did not constitute a final order, but instead

contemplated further agency proceedings, Judge Kollar-Kotelly observed

that

> [in finding that] the BIA and IBIA had acted "arbitrarily,
> capriciously, and contrary to law in refusing to review for
> themselves the intensely disputed tribal procedures
> surrounding the adoption of the tribal constitution. . .," the
> Court signaled that any proceedings subsequent to the Court's
> ruling on the pending cross-motions must involve a review, by
> the BIA and/or IBIA for themselves, of the procedures
> surrounding the adoption of the tribal constitution.

Ransom II, (A.R. Vol. I) (Dkt. No. 49) Tab 20, at 17 (internal citations

omitted).  Tellingly, Judge Kollar-Kotelly noted that

> [t]he Court did not expressly order [in *Ransom I*] the BIA to
> recognize the Three Chief System of government, nor did the
> Court identify, in the event of such recognition, which three
> Chiefs should be recognized.

*Id.*  As a result, in the *Ransom* court's view there remained "more than the

mere 'ministerial' implementation of [the] Court's ruling."  *Id.*

Despite this clearly articulated expression of the *Ransom* court's

opinion that further agency level proceedings were required in order to

evaluate and analyze the circumstances surrounding the adoption of the

Constitution and the broader question of Tribal leadership, the BIA instead regarded its post-*Ransom I* task as purely mechanical, believing that Judge Kollar-Kotelly had left it with no alternative but to recognize the Three Chiefs Government.  Indeed, by its own admission this view was taken by the BIA notwithstanding belief of those within the agency that the arguments advanced by the Constitutional representatives were meritorious.  A.R. Vol. I (Dkt. No. 49) Tab. 9.

In a further attempt to avoid the necessity of addressing the issue the BIA subsequently adopted the position that the controversy would effectively be mooted by the conducting of elections within the Three Chiefs framework, apparently suggesting that the Constitutional representatives could assume Tribal leadership and vindicate their position by standing for election under that governmental format.  While there is perhaps certain facial appeal to this suggestion, by formalizing this position the BIA avoided the ultimate question of the form of Tribal leadership to be recognized, an issue whose resolution by the agency was effectively mandated by the court's decision in *Ransom I*.

One could perhaps argue that the BIA's failure to perform the analysis required by Judge Kollar-Kotelly in *Ransom I* was justified based

upon subsequent elections and referenda which seemingly confirmed the

desire of the Mohawk people to revert to the Three Chief form of

government and empower those advocating its implementation in

positions of leadership.  Questions remain, however, as to whether Tribal

leadership may by resolution effectively override an enactment by the

people of a Constitution which contains its own provisions for amendment.

*See* A.R. Vol I (Dkt. No. 49) Tab 10, Const. Art. XVI.  As the Tribal Court

has noted, moreover, there are questions as to whether the referendum

enacted in 1996 relating to the validity of the Constitution was merely

advisory, and thus of no legal effect – something which was suggested by

the Tribal Court in *Lazore v. St. Regis Mohawk Tribal Council &Election*

*Bd.*, No. 96CI0080 (SRMTC June 7, 1996).  Additional questions persist

as to whether the subsequent decertification resolution was properly

enacted, particularly in view of the Tribal Court's finding that the

decertification was adopted under duress, and as such was legally

ineffective.  *See Lazore v. St. Regis Mohawk Tribal Council & Election*

*Bd.*, No. 96CI0080 (SRMTC July 12, 1996) (*Lazore II*).  The significance

of these subsequent events is thus plainly open to question, and should

have been analyzed by the BIA as part of the analysis envisioned in

*Ransom I.*

Defendants argue that the Constitutional Government proponents are not well positioned to assert the agency's failure to conduct proceedings designed to address and resolve the issue of whether the Constitutional Government should be recognized since in its post-*Ransom I* submissions to the agency they did not request that such a process be undertaken.  This position is echoed in the June 5, 2002 McCaleb letter, setting forth the BIA's apparent position that the agency's failure to address the issue was the result of the fact that it was not pressed by the plaintiffs.  A.R. Vol. I (Dkt. No. 49) Tab 32.

It is true that plaintiff's submissions to the agency following in the wake of *Ransom I*, including its appeal to the IBIA, reflect that the focal point of the plaintiffs' post-*Ransom* campaign was to convince BIA officials that even assuming the validity of the court's decision, the agency nonetheless erred in recognizing those in power under the Three Chiefs regime.[14]  *See*, *e.g.*,  A. R. Vol. I (Dkt. No. 49) Tab 10, at 1-2.  Plaintiffs'

---

[14]      In their IBIA submission, by way of example, plaintiffs made the following statements:

> This appeal does not seek to contradict the
> decision of [*Ransom I*].  Rather, we start at
> the end point of the [*Ransom I*] decision: the

submissions, however, when read in context, make it clear that this position was taken upon the assumption that *Ransom I* would ultimately be reversed on appeal.  A. R. Vol. I (Dkt. No. 49) Tab 10.

In any event the agency's responsibilities on remand should have been dictated not by the plaintiffs' submissions, but rather the scope of the district court's order.  The role of the district court in *Ransom* was to review the BIA's determination and ascertain whether it could withstand APA scrutiny based upon the record before the agency.  *See Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S. Ct. 579, 582 (1976).  The court would have overstepped its reviewing authority under the APA by independently combing the record and other evidence extrinsic bearing upon the issue and substituting its judgment for that of the agency.  *Id.*  In recognition of this inherent limitation, Judge Kollar-Kotelly chose not to usurp the administrative prerogative of the BIA and substitute her judgment for that of the agency

---

Constitution did not pass and its predecessor
Three Chief system of government is still in
place.  The question for the BIA was then
"Who are the elected representatives of the
saint [sic] Regis Mohawk Tribe?"

A.R. Vol. I (Dkt. No. 49) Tab 10, at 1.

on the ultimate issue of tribal authority, simply articulating her view that the BIA's determination lacked support from the record, and remanding the matter to the agency for a further, thorough review of the leadership issue.

In sum, Judge Kollar-Kotelly's decision in *Ransom I* suggests – and her subsequent decision in *Ransom II* confirms – the court's expectation that the agency would conduct a review of the matter to determine for itself in the first instance whether the Constitutional Government should be recognized. It is equally true that instead of following that mandate by engaging in proceedings reasonably calculated to address and resolve the ultimate issue of whether the Constitution was properly adopted by the Tribe and, if so, later rescinded by subsequent referenda, the BIA mistakenly interpreted the court's decision as a directive that the agency recognize the legitimacy of the Three Chiefs Government, even while at the same time voicing reservations over the defensibility of that result. Under these circumstances, I find that the actions of the agency were arbitrary and capricious, and thus must be set aside.

### 2. Authority Of Tribal Courts

The second aspect of plaintiffs' APA challenge concerns letters

44

expressing the DOI's view that the St. Regis Tribal Courts lack any authority to act on behalf of the Tribe.  Plaintiffs maintain that those letters, voicing opinions which hinge upon the continued vitality of the Three Chiefs form of government, cannot withstand judicial scrutiny.

As a preliminary matter, defendants challenge plaintiffs' right to contest the Hogen letters under the APA, characterizing them as agency responses which did not finally determine the rights or obligations of parties, particularly since they were not challenged by the plaintiffs internally within the BIA.  Defendants assert that those letters represent nothing more than a mere expression of the agency's opinion, in response to the court's query, and as such are not reviewable.[15]

One portion of the APA which controls judicial review provides, in relevant part, that

> [a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.  *A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.*

5 U.S.C. § 704 (emphasis added).  To determine whether, for purposes of

---

[15]      In making this argument, defendants nonetheless acknowledge the authority of the author of those opinions to act on behalf of, and to bind, the agency.

the APA, an agency action has achieved the requisite degree of finality,

the Supreme Court has outlined a two part test, articulated to encompass

the following inquiries:

> First, the action must mark the "consummation" of
> the agency's decisionmaking process – it must not
> be of a merely tentative or interlocutory nature.
> And second, the action must be one by which
> "rights or obligations have been determined", or
> from which "legal consequences will flow".

*Bennett v. Spear*, 520 U.S. 154, 177-78, 117 S. Ct. 1154, 1168-69 (1997)

(internal quotations and citations omitted); *see In re Sac & Fox Tribe of*

*the Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 756 (8th

Cir. 2003).

The requirement that internal administrative remedies first be

exhausted is subject to certain exceptions in instances where the need to

obtain immediate judicial review outweighs the governmental interests

associated with efficiency or administrative autonomy sought to be served

by the exhaustion doctrine.  *See generally In re Sac & Fox Tribe*, 340 F.3d

at 757.  Under this exception to the exhaustion requirement the courts

have identified three circumstances in which this exception would apply,

including where 1) the requirement of exhaustion would "occasion undue

prejudice to subsequent assertion of a court action"; 2) the administrative

46

remedy is inadequate in light of "some doubt as to whether the agency was empowered to grant effective relief"; or 3) the administrative body "is shown to be biased or has otherwise predetermined the issue before it." *McCarthy v. Madigan*, 503 U.S. 140, 146-48, 112 S. Ct. 1081, 1087-88 (1992); *In re: Sac & Fox Tribe*, 340 F.3d at 757 (citing *McCarthy*).[16]

A review of the history of proceedings before the BIA makes it clear that the Hogen letters fall comfortably within the confines of the third exception. Those letters, articulating an official agency position, represent no more than an extension of the agency's view, which it deems itself constrained to apply, that in light of *Ransom I* it must recognize the Three Chiefs Government and, consequently, treat any actions taken by the Constitutional Government as invalid. Given this predisposition, it would be a pointless exercise to require the plaintiffs to pursue the matter internally within the agency, particularly knowing with certainty the predicted outcome. Accordingly, I find a basis to review those determinations notwithstanding this lack of finality.

In support of their assertion that the Hogen letters are not subject to

---

[16]     While *McCarthy*, which involved claims asserted by a prison inmate, has been statutorily displaced, the rule announced by the Court in that case retains vitality outside of the prisoner litigation arena. *In re Sac & Fox Tribe*, 340 F.3d at 757 n.1.

review under the APA, defendants place heavy reliance upon *Association of International Automobile Manufacturers, Inc. v. United States Environmental Protection Agency*, 208 F.3d 1 (1st Cir. 2000).  A review of the court's decision in that case, however, reveals that it is readily distinguishable from the situation now presented.  In that case, when confronted with a challenge of the propriety of certain mandates related to automobile emissions, the First Circuit stayed the appeal and deferred under the doctrine of "primary jurisdiction" to the EPA for that agency's opinion concerning the matter – a step which the court characterized, in hindsight, as unwise given that "the agency was not in a position to determine any of [those issues] authoritatively".  *Association of Int'l Auto. Mfrs., Inc.*, 208 F.3d at 4-5.  The court later concluded that the resulting opinion letter did not qualify as a final agency action since it did "not purport to be a definitive statement by the agency of its position on [the] various issues [presented] . . . [n]or does the opinion letter have any direct or immediate consequences for the parties."  *Id.* at 5.

In this case, by contrast, the opinion at issue was elicited on a matter entrusted to BIA expertise, and was expected to have concrete legal significance to the plaintiffs, as parties in the action in the context of

48

which the question was posed.  Having reviewed the matter, I find that the

two opinion letters do constitute final agency actions which are thus

properly subject to review under the APA.

Turning to the merits of plaintiffs' claims with respect to those

letters, I begin by noting that to say the question of Tribal Court authority

is a complex one is an understatement.  Another judge of this court has

already determined that at least as of November of 1998, there was an

active and operating St. Regis Mohawk Tribal Court whose existence

could be traced back in 1994 of the Judiciary Act.  *See Basil Cook*

*Enters., Inc. v. St. Regis Mohawk Tribe*, 26 F.Supp.2d 446 (N.D.N.Y.

1998) (McAvoy, J).  Quite obviously, however, the *Basil Cook* court did not

consider the implications of later-passed Tribal Council Resolutions 99-02

and 2000-136, upon which Associate Solicitor Hogen's July 12, 2002

letter hinges, purporting to abolish the Tribal Court System created in

1994.

The opinion of the agency, as articulated in Associate Solicitor

Hogen's letters, appears to link the continuing vitality of the Tribal Court to

the Constitutional reform movement.  Creation of the Tribal Court System,

however, occurred in 1994, and thus predated the Tribal Constitutional

referendum in June of 1995 under which the plaintiffs claim their

leadership authority.  As the Hogen letters highlight, the issue is also

clouded by virtue of the controversy which arose surrounding appointment

of judges of the Tribal Court, leading the Second Circuit in one relatively

recent case to demur, when confronted with questions surrounding that

Tribal Court's status, deferring instead to the Tribal judiciary to resolve

questions of its authority.[17]  *Basil Cook Enters., Inc. v. St. Regis Mohawk*

*Tribe*, 117 F.3d 61, 68 (2d Cir. 1997).

The issue addressed in the Hogen letters is undeniably linked to the

ultimate question of Tribal leadership.  The Tribal Court was founded in

---

[17]    The issue of Judge Deom's authority was raised in *Basil Cook Enterprises, Inc.*  Noting the various historical developments bearing upon the question, the Second Circuit opted in favor of abstention, succinctly explaining its reasoning as follows:

> Plaintiffs invite us to enter this interpretative thicket.  We decline to do so.  These constitutional questions are, for good reason, matters of tribal law reserved to the tribal judiciary to resolve.

117 F.3d at 68 (citation omitted).

The Second Circuit was later asked once again to consider whether the St. Regis Mohawk Tribal Court existed.  *See Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76 (2d Cir. 2001).  In response, the court observed that "[i]t appears from published opinions that a tribal court has existed and may exist now" but found it unnecessary to resolve the issue because in any event deference to Tribal Court jurisdiction in that case was not required since there was no pending proceeding before the Tribal Court related to the controversy in issue.  268 F.3d at 83-84.

1994 by enactment which the parties do not appear to challenge, but was allegedly abrogated by 1999 and 2000 Tribal Council Resolutions which are hotly contested, and whose vitality depends upon the recognition of the Three Chiefs Government at the time of their enactment.

In this regard, plaintiffs argue that the first such resolution predated Judge Kollar-Kotelly's decision in *Ransom I*, at a time when the BIA properly recognized the Constitutional Government as controlling, and should therefore be regarded as invalid even in the face of the later reversal of the agency's position.  I reject this artificial distinction, however, since the ultimate issue is what position the BIA should now take concerning the appropriate form of Tribal leadership in power in 1999.  If, upon remand for consideration of the matters addressed in the first two challenged administrative actions, the BIA finds – after conducting a full and fair review – that the Three Chiefs Government was in existence at the time, then it would appear that the Tribal Courts are no longer operating with legitimate authority from the Tribe.  If, on the other hand, the authority of the Constitutional Government is sustained by the BIA, then the Tribal Court exists, the judges of that court have been properly appointed, and the propriety of Associate Solicitor Hogen's letters

51

cannot be sustained.

IV.    <u>SUMMARY AND ORDER</u>

The question of Indian governance is a matter properly entrusted to each particular tribe and, to the extent that they may exist, the tribal courts.  Despite this indisputable core precept, however, the question of who the federal government should recognize for purposes of its dealings with a tribe as duly authorized leaders is properly within the province of the BIA.

The issue of Tribal governance for purposes of dealing with the St. Regis Mohawk Tribe is, to be sure, a question that is both complex and controversial, as evidenced by the fact that the agency and courts have been unable to achieve unanimity on the issue.  It is also a matter which this court is not empowered to decide, nor is its determination necessary for resolution of the questions raised by plaintiffs' APA challenge.

Critical to the present dispute is my finding that instead of undertaking a detailed factual inquiry, with input from both sides, and determining the issue of Tribal leadership based on those presentations, as contemplated by the court in *Ransom I*, the BIA instead considered itself bound by Judge Kollar-Kotelly's decision in that case to recognize

52

the Three Chiefs Government despite the agency's continued belief that

the Constitutional Government had raised legitimate arguments

concerning its authority.  It is clear, however, that the *Ransom I* decision

did not mandate such a result, and indeed Judge Kollar-Kotelly herself

has said as much in a subsequent decision.

It may be that those advocating in favor of the Three Chiefs

Government ultimately prevail and convince the BIA of the correctness of

their position on this score, particularly in view of intervening referenda

and elections seemingly reflecting the will of St. Regis Mohawk people to

revert to the Three Chief System.  Before adopting this position and

rejecting potentially conflicting election results, however, the BIA must

allow the matter to be fully aired, and when a decision is made regarding

what Tribal leadership is to be recognized, the agency should detail the

reasoning employed to arrive at the determination.  The agency's decision

to blindly accept the Three Chief Government in light of *Ransom I*, in lieu

of engaging in such a meaningful analysis, cannot withstand judicial

review even under the APA's highly deferential standard.  Accordingly,

that determination will be set aside.

Turning to the question of the agency's position on the Tribal Courts,

it appears clear that the Tribe's judiciary, which was created in 1994 and thus predated the birth of the Constitutional Government, nonetheless depends for its continued authority upon recognition of the Constitutional Government, inasmuch as enactments adopted by the Three Chiefs Government have since abrogated the Courts, and in any event the Three Chiefs Government has never appointed a duly authorized judge to act on behalf of the Courts.  Since the propriety of the Hogen letters addressing the authority of the Tribal Courts is therefore entirely dependent upon the soundness of the agency's position regarding the underlying dispute over Tribal leadership, those letters similarly cannot withstand judicial review.

The history of the leadership struggles among members of the Mohawk Nation, which at times have spawned violence, is well-documented.  *See* Robert B. Porter, *Building a New Longhouse: The Case for Government Reform within the Six Nations of the Haudenosaunee*, 46 Buff. L. Rev. 805 (1998).  As one author has noted,

> any long term hope of establishing strong unified government at Akwesasne will be dependent upon finding a way to bridge the gap between those willing to accept a democratic Mohawk elected government with those who maintain adherence to the Gayanashagowa [the "Great Law of Peace" upon which the Iroquois Confederacy, or Haudenosaunee, operated].  Until that time, it is likely that government division will ensure that the long term interests of the Mohawk people will continue to

be subordinated to political and economic factionalism.

Porter, 46 Buff. L. Rev. at 854.

Prior to oral argument of the cross-motions in this APA action, the parties reported to the court that they had engaged in settlement discussions among themselves, with some promise.  Ultimately, while those negotiations ultimately failed, it appears based upon the record now before the court that the political gap is being bridged.  It is questionable whether this decision will assist in fostering those efforts, or instead be deleterious to that process.  Nonetheless, in deciding the issues now presented I cannot overlook the BIA's stark failure to conduct a meaningful review and determine for itself whether to recognize the Constitutional Government, or instead the traditional Three Chiefs regime, and thus feel constrained to strike down the four agency actions now under challenge.

Based upon the foregoing it is hereby

ORDERED that the declaration of Lorraine M. White (Dkt. No. 43, Attachment 1), submitted by the defendants in connection with the pending cross-motions, is hereby STRICKEN from the record; and it is further

ORDERED that defendants' motion for summary judgment is DENIED and plaintiffs' motion for summary judgment in their favor is GRANTED; and it is further

ORDERED that the clerk shall enter a final judgment in plaintiffs' favor VACATING the four agency actions involved and REMANDING the matter to the DOI for further proceedings consistent with this opinion; and it is further

ORDERED that the clerk promptly forward copies of this order to counsel for the various parties, both electronically and by first class mail.

David E. Peebles
U.S. Magistrate Judge

Dated:      February 11, 2004
            Syracuse, NY

G:\Civil\2002\02-CV-1072\dec&order3.wpd